Ricky WYATT, By and Through his aunt and legal guardian, Mrs. W.C. RAWLINS, Jr., et al., Plaintiffs,

Diane Martin, et al., Plaintiffs–Intervenors,

v.

J. Michael HORSLEY, as Commissioner of Mental Health and Mental Retardation, and the State of Alabama Mental Health Officer, et al., Defendants,

United States of America, et al., Amici Curiae.

Civ. A. No. 3195–N.

United States District Court, M.D. Alabama, N.D.

May 2, 1991.

Ira Burnim, Washington, D.C., for proposed intervenor Bretz.

R. Emmett Poundstone, III, Ricky Trawick, Ala. Dept. of Mental Health, Montgomery, Ala., Joel Kline Christopher Cerf, Washington, D.C., for Horsley and Dept. of Mental Health.

Andrew J. Barrick and Mitchell W. Dale, U.S. Dept. of Justice, Civil Rights Div. Washington, D.C., for U.S.

Byrd R. Latham, Patton, Latham, Legge & Cole, Athens, Ala., for Gunter, Steagall and Brassell.

David Ferleger, Philadelphia, Pa., Reuben Cook, Edward Stevens, Victoria Farr, and Donald Tipper, Ala. Disabilities Advocacy Program, Tuscaloosa, Ala., for intervenors Martin, et al.

Peter G. Thompson, Sandra Lord, Washington, D.C., for plaintiffs.

Pamel Chen, U.S. Dept. of Justice Civil Rights Div., Sp. Litigation Section, Washington, D.C., for amicus curiae U.S.

Algert Agricola, Mark Montiel, and David Byrne, Montgomery, Ala., for State defts.

R. David Christy, Montgomery, Ala., for Horsley.

## ORDER

MYRON H. THOMPSON, Chief Judge.

This long-standing class action, originally filed in 1970 by patients under the care and custody of the Alabama Department of Mental Health and Mental Retardation, is now before the court on the plaintiffs' and defendants' joint request for approval and entry of two consent decrees. These decrees propose to modify several of the court's previous orders that require the defendants to comply with certain minimum constitutional standards for adequate care of the mentally ill, commonly referred to as the "*Wyatt* standards" for the mentally ill. *See Wyatt v. Stickney,* 344 F.Supp. 373 (M.D.Ala.1972), *aff'd in part,* 503 F.2d 1305 (5th Cir.1974). The court conducted a hearing on the proposed consent decrees on March 7, 1991, and has also provided notice to and received a number of comments from individuals and organizations concerned about these modifications. For the reasons set forth below, the court will not now accept or reject the decrees, but rather, by agreement of the parties, will allow counsel for the plaintiffs and defendants an opportunity to submit additional evidence in support of the decrees and to clarify or change the decrees where necessary.[1]

### I.

After closely examining the decrees, and reviewing the arguments presented by counsel and others, the court has several concerns about the proposed changes. In large part, the court is uneasy with the process by which the decrees were formulated, agreed to, and presented. Neither plaintiffs' nor defendants' counsel have provided the court with any evidence in support of the decrees, either at the fairness hearing or otherwise, with the exception of two documents indicating that notice of the decrees and the hearing had been mailed to several organizations and persons. Counsel for both sides have apparently failed to solicit actively comments on—let alone obtain any backing for—the proposed changes from either mental health experts, plaintiff class members, or other interested individuals or organizations. At the March 7 hearing, plaintiffs' counsel did represent that the "*Wyatt* Committee," an advisory group of mental health experts appointed by the court, endorsed both decrees. However, none of the members of the committee appeared at the hearing to address the merits of the new standards, and the only testimony about the decrees presented to the court was sharply negative.[2] Moreover, the court has received close to 30 written objections to the proposed changes from mental health advocacy organizations, treatment professionals, including the Alabama Psychological Association, and former patients, but

---

1. Counsel for plaintiffs and defendants agreed to proceed in this manner during a telephone conference with the court on March 25, 1991.

2. It is one thing for the court to be told in conclusory fashion that the *Wyatt* Committee supports or does not object to the decrees, and quite another for the court to be presented with evidence of the committee's views on specific provisions of the decrees, particularly those that have sparked objections from concerned persons and groups familiar with the state's mental health system.

has not received a single written comment approving of the decrees. The court, therefore, has little if any evidentiary basis for evaluating the propriety of the two decrees or the merits of the various objections to them. Rather, counsel have essentially asked the court to "rubber stamp" their opinions that the changes are warranted.

■ It is true that voluntary settlement is recognized as the preferred method of resolving disputed issues in class litigation. *See Bennett v. Behring Corp.*, 737 F.2d 982, 987 (11th Cir.1984). However, because the settlement process in class actions is more susceptible than adversarial adjudications to certain types of abuse, the proponent of a settlement in a class lawsuit bears the burden of "developing a record" demonstrating that the settlement "is fair, reasonable, and adequate."[3] *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1147 (11th Cir.1983). *See also* Fed.R.Civ.P. 23(e) (requiring judicial approval of any settlement negotiated in class action). Although the opinions of class counsel are a substantial factor in the court's evaluation of a proposed consent decree under this standard, the degree of deference accorded counsel's judgment depends on, among other things, the amount of support or opposition within the class to the settlement. *Holmes*, 706 F.2d at 1149. *See also Paradise v. Wells*, 686 F.Supp. 1442, 1444 (M.D.Ala.1988). Where the class "speaks in several voices"—in other words, where there is disagreement among class members as to the desirability of a particular settlement—"it may be impossible for the class attorney to do more than act in what he believes to be the best interests of the class as a whole." *Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir.), *cert. denied*, 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65

(1982) (citation omitted). However, the proportion of a class that objects to a proposed settlement may at some point become so large or the number of members endorsing the settlement so small, that in a very real sense it may be said that the attorney has settled the lawsuit unilaterally, without the backing, and presumably not in the best interests, of "the class." *See Holmes*, 706 F.2d at 1149; *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1217–18 (5th Cir.1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). However difficult it may be to translate such a standard into a bright-line rule, the court has little difficulty concluding that this "point" is passed where, as in this case, a number of concerned parties have attacked the proposed changes, but not a single class member has come forward in favor of the consent decrees and, as far as the court can tell, plaintiffs' counsel has agreed to the settlement "without the participation or consent" of any "class members," named or absent. *Pettway*, 576 F.2d at 1216–17. *See Holmes*, 706 F.2d at 1150. *Compare Bennett*, 737 F.2d at 988 n. 10; *Parker*, 667 F.2d at 1212; *Paradise*, 686 F.Supp. at 1445.

■ Counsel for the parties have suggested, in response to these concerns, that plaintiffs' counsel is not legally obligated to heed or even consider the views of any of the various advocacy groups and ex-consumers who have weighed in against the decrees, because the class he represents—his "clients"—consists only of current patients confined in state mental health facilities. The parties' counsel have further suggested that the court should construe the lack of any challenges to the proposed changes from these individuals as

---

3. The court recognizes that an agreement between parties to modify an existing consent decree in a class action may differ in some respects from a negotiated settlement of an unresolved lawsuit. Although appellate decisions that recognize a district judge's authority to disapprove a class settlement under certain circumstances all appear to have involved proposed settlements of pending litigation, controlling case law also makes clear that a request to modify an existing consent decree must be similarly accompanied by supporting evidence and scrutinized by the district court to determine if modification is justified. *See Board of Educ. of Oklahoma City Public Schools v. Dowell*, — U.S. ——, ——, 111 S.Ct. 630, 636–38, 112 L.Ed.2d 715 (1991); *Hodge v. Dep't of Housing*

a sign of tacit support.[4] The court cannot accede to these arguments. To be sure, in some cases a court may properly interpret the absence of objections from a majority of the plaintiff class as indicating support for the proposed modification or settlement. However, an absence of objections to a settlement from class members does not always indicate support for the settlement, and particularly should not be interpreted so in a case like this one where most of the absent plaintiffs are unlikely to be able to assess the decrees or voice their comments on the proposed changes. The court understands the difficulties class counsel faces in endeavoring to solicit the views of such persons. However, to the extent plaintiffs' counsel cannot receive input from class members, he must seek it from such secondary sources as public interest organizations, former mental patients, and family members and caregivers who have day-to-day contact with class members in the state's institutions. While fulfilling this duty may render the settlement process more complex and problematic, it is essential if the class attorney is to persuade the court that an agreement is in the best interests of the class, rather than

merely expect the court to trust his professional judgment. To allow any less in a class action would be to accept the cynical view that the attorney for the plaintiffs is "the *dominus litus,*" that is, the true master of the lawsuit, and the plaintiffs "only a key to the courthouse door dispensable once entry has been effected." *Saylor v. Lindsley,* 456 F.2d 896, 899 (2nd Cir.1972).[5]

## II.

The somewhat peremptory process by which these consent decrees have come before the court is of even greater concern because the court is plagued by a number of substantive questions about the proposed modifications in the *Wyatt* standards. Several of these touch on matters discussed in the objections to the decrees filed with the court, yet none have been adequately addressed by counsel for the plaintiffs or defendants: [6]

First, how and why would the existing or proposed standards apply differently to Thomasville and Eufaula than to other state mental health institutions if the decrees were approved? [7]

Second, when would a physician be required to physically examine a patient who

---

*and Urban Development,* 862 F.2d 859, 861–64 (11th Cir.1989) (per curiam).

**4.** According to class counsel, notice of the proposed decrees was posted in the common areas of the various state mental health institutions.

**5.** *See also Holmes,* 706 F.2d at 1150 ("Reliance on counsel's opinion tends to render the district court captive to the attorney and fosters rubber stamping by the court rather than the careful scrutiny which is essential in judicial approval of class action settlements").

**6.** Although plaintiffs' counsel did address several aspects of the plaintiff-intervenors' attack on the decrees at the fairness hearing, his response to these objections was not comprehensive and he failed to file a brief on this matter. The same holds true for his comments on the advantages of the new standards.

**7.** On the one hand, it appears to the court—and counsel have represented—that the only practical changes that the new classifications of Thomasville and Eufaula would accomplish

would be, first, to allow any "appropriate qualified mental health professional," rather than only psychiatrists, to head treatment teams at these two facilities; and second, to allow mental health staff to write only monthly rather than weekly progress reports on "long-term" patients such as those in Thomasville and Eufaula. However, the court is concerned that the removal of Thomasville and Eufaula "residents" from the category of "patients," appears to exclude them from many of the preexisting *Wyatt* standards. Moreover, the court is also unclear on what kind of accreditation these institutions are expected to obtain before the new standards are applied to them. While plaintiffs' counsel have suggested that neither institution is currently accredited and therefore none of the new standards will apply to either Thomasville or Eufaula, the defendants have indicated, in their written response to the objections, that Eufaula has been accredited as a psychoeducational rehabilitation center. The first consent decree, in its own words, purports to apply to "facilities accredited by the Joint Commission on the Accreditation of Health Organizations (JCAHO) or by other accrediting bodies mutually approved by the parties."

has been subjected to emergency restraint or seclusion under the proposed standard 7? [8]

Third, how often and for what reasons would expedited or "emergency" electro-convulsive treatment, as described in the proposed standard 9(3), be considered necessary? [9]

Fourth, how often and for what reasons would *non*-emergency seclusion or restraint, as described in the proposed standard 7, be considered necessary; [10]

Fifth, according to the proposed standard 9(3), would the psychiatrist who recommends that a patient receive electro-convulsive therapy be required to be trained and experienced in this form of treatment? [11]

Sixth, to what extent are defendants now in compliance with the standards that the consent decrees propose to modify?

Seventh, what problems characterize those standards that the consent decrees propose to modify?

Eighth and finally, what are the advantages of the proposed standards over the existing ones?

### III.

■ Because of its concerns about both the content of the decrees as well as the process by which the proposed changes in the *Wyatt* standards were arrived at and presented, the court cannot and will not approve the decrees on the present record. As stated, the court will allow counsel for the parties an opportunity, in light of the court's comments, to clarify or change the decrees where necessary and to submit additional evidence in support of the decrees. *See Paradise v. Wells*, 686 F.Supp. 1442, 1445 (M.D.Ala.1988) (counsel for parties required to submit additional evidence regarding whether plaintiff class supported proposed settlement).

Accordingly, upon consideration of the plaintiffs' and defendants' joint consent to entry of consent decrees, filed on January 10, 1991, and by agreement of the parties, communicated to the court during a telephone conference on March 25, 1991, it is ORDERED as follows:

(1) By no later than May 24, 1991, counsel for the plaintiffs and defendants shall meet to discuss possible clarifications or changes in the proposed consent decrees, including but not limited to ones related to (a) the court's concerns as identified in this order, and (b) the various objections to the decrees that have been filed with the court or presented at the March 7, 1991 fairness hearing;

(2) By no later than June 7, 1991, counsel for the plaintiffs and defendants shall inform the court jointly and in writing as to the clarifications and changes in the consent decrees, if any, that they propose; [12] and

(3) By no later than June 7, 1991, counsel for the plaintiffs shall file with the court evidentiary materials indicating the nature and extent of support for the decrees by class members or other persons or organizations interested in or knowledgeable about conditions in the state's mental health institutions, or, in the alternative,

---

**8.** The decree would appear to allow emergency seclusion and restraint to be continued indefinitely, without any physical examination requirement, as long as (1) every four hours, a physician verbally approves continuation of seclusion or restraint as clinically necessary, and (2) a physician reviews and signs an emergency seclusion and restraint order within 12 hours of its initial use. However, counsel for the defendants have represented to the court that the new standard would require that a patient be physically examined by a physician before seclusion or restraint could be extended beyond four hours.

**9.** At the March 7 hearing on the consent decrees, counsel for the defendants were unable to articulate any reason for this new provision.

**10.** When the court inquired into this issue at the hearing on the decrees, none of the counsel for the parties was able to suggest an answer. Nor were they able to inform the court as to how seclusion and restraint are currently being used—for example, whether such measures are predominantly employed in emergency or in non-emergency situations.

**11.** The decree appears not to require this, but defendants' counsel indicated otherwise at the March 7 hearing.

**12.** By such a time, counsel may also wish to file new proposed consent decrees if they have chosen to alter in any way the decrees now before the court.

request a hearing to present additional live witness testimony on this matter.

It is further ORDERED that, by no later than June 7, 1991, counsel for any party may file additional evidentiary materials regarding the proposed decrees or may request a hearing to present additional live witness testimony about the decrees.